## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| CARDAUTH SOLUTIONS LLC, | |
| *Plaintiff,* | Civil Action No. 1:26-cv-01065-RP |
| v. | |
| THALES DIS CPL USA, INC., | |
| *Defendant.* | **JURY TRIAL DEMANDED** |

PLAINTIFF CARDAUTH SOLUTIONS LLC'S OPPOSITION

TO DEFENDANT'S MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES....................................................................................................ii

I.     CLAIM 28 IS DIRECTED TO A SPECIFIC ACCESS-CARD AUTHENTICATION ARCHITECTURE.........................................................................................................2

    A.    The Old Way: Authentication and Key Management Were Separate Jobs.................2

    B.    The New Way: The Challenge Message Becomes the Key-Delivery Vehicle ...........3

    C.    The Specific "How" of Claim 28 ...............................................................................5

II.     ALICE STEP ONE: CLAIM 28 IS NOT DIRECTED TO AN ABSTRACT IDEA..........6

    A.    Thales's Abstract Idea Deletes the Claim's Message Architecture.............................6

    B.    Claim 28 Is Directed to a Specific Access-Card Authentication Improvement..........7

    C.    Thales's Broader Data-Processing Cases Do Not Control .........................................9

III.     ALICE STEP TWO: THE ORDERED COMBINATION SUPPLIES AN INVENTIVE CONCEPT ...............................................................................................................11

    A.    Thales Atomizes the Ordered Combination Into Familiar Pieces ............................11

    B.    The Inventive Concept Is the Ordered Access-Card Arrangement ...........................11

    C.    Thales Cannot Establish Conventionality on the Pleadings .....................................12

IV.     AT A MINIMUM, THE ALICE MOTION CANNOT BE RESOLVED BY ASSUMING THALES'S DISPUTED CLAIM MEANINGS ..........................................................13

V.     THALES'S § 112 ARGUMENT FAILS.......................................................................14

    A.    Claim 28 Is Not Internally Inconsistent...................................................................14

    B.    The Specification Supports CardAuth's Reading......................................................15

    C.    At Minimum, The Issue Is Claim-Construction Dependent and Premature..............17

VI.     DISMISSAL WITH PREJUDICE WOULD BE IMPROPER.......................................17

## TABLE OF AUTHORITIES

**Cases**

*A Pty Ltd. v. Amazon.com, Inc.*, No. 1:15-CV-154-RP, 2015 WL 10990117 (W.D. Tex. Oct. 8, 2015)..................................................................................................................................13

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ...............12

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014)......................................................11

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016)....11

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249 (Fed. Cir. 2010) ............15

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006)......................................................15

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019)....................................10

*Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) .......................................15

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014)...............................................................................................................................7, 9

*Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373 (Fed. Cir. 2024) ...................................6

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021)....................9

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016).......................................9

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509 (Fed. Cir. 2012)...........................................17

*In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016).......................................10

*Maxell, Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369 (Fed. Cir. 2024)............................................15

*MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019).....................................................13

*Ollnova Techs. Ltd. v. ecobee Techs. ULC*, Nos. 2025-1045, 2025-1046, slip op. (Fed. Cir. June 4, 2026)..................................................................................................................................9

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303 (Fed. Cir. 2020)...................................8

*UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984 (Fed. Cir. 2024) ..................................................17

**Statutes**

35 U.S.C. § 101 ...............................................................................................................2, 13, 18

35 U.S.C. § 112 .........................................................................................................2, 13, 17, 18

**Rules**

Federal Rule of Civil Procedure 12 .....................................................................................passim

**INTRODUCTION**

Thales's motion to dismiss ("Mot.") asks the Court to invalidate Claim 28 on the pleadings by doing two things Rule 12 does not permit: abstracting the claim until its architecture disappears and resolving disputed claim meaning in Thales's favor.

Claim 28 is not directed to "authentication" in the abstract, and it is not directed to the generic acts of receiving, decrypting, and storing data. It claims a specific access-card authentication architecture. The access card receives payload-bearing challenge data in place of a bare challenge; that challenge data carries encrypted key-management information; and the access card obtains and stores that information and processes the challenge to generate the authentication response. Ex. A, 33:55–34:22. That is the claimed "how"—a particular authentication message processed by the access card itself.

The specification explains why that architecture matters. In the prior architecture described in the patent, authentication and key-management delivery could remain separate message jobs, requiring intermediate software to receive, parse, decrypt, and pass key-management payloads before the access card could use them. Ex. A, 13:30–14:11. The '013 Patent changes that arrangement by changing the message design. It teaches that authentication-request data strings can be "formatted to serve as challenges," and that challenge-response data strings can serve as vehicles for carrying key-management information. Ex. A, 2:14–23. In the combined secure-session/key-transmission embodiment, key-management information can be hidden within seemingly random challenge strings. Ex. A, 15:22–36.

Thales's § 101 argument ignores that architecture and reduces Claim 28 to generic data handling. Its § 112 argument then depends on construing "challenge data is received in lieu of a challenge" to mean that the received challenge data cannot contain the challenge material later processed by the access card. Both arguments fail. The First Amended Complaint pleads the claimed architecture and a concrete Thales implementation, including U2F Authenticate request data containing challenge-related material and a key handle, Thales FIPS materials identifying keys used for encryption, decryption, and authentication of key handles, and token memory that

1

stores recovered key-management information at least transiently during authentication. First Amended Complaint ("FAC"), ECF No. 17, ¶¶ 7–13, 17–22. At a minimum, Thales's motion turns on disputed claim meaning and conventionality issues that cannot be resolved against CardAuth at the pleading stage. The motion should be denied.

## I.      CLAIM 28 IS DIRECTED TO A SPECIFIC ACCESS-CARD AUTHENTICATION ARCHITECTURE

### A.      The Old Way: Authentication and Key Management Were Separate Jobs

The specification first identifies a concrete access-card architecture problem: in the separate-message architecture it describes, authentication and key-management delivery are handled as separate jobs. In the ordinary challenge-response interaction, an access system or card reader sends the access card a random challenge, and the access card responds using key information already stored on the card. But when a remote server needs to deliver or update key-management information, that key information travels through a separate path. In that separate path, the intermediate computer receives the server transmission, parses it to obtain the key, initiates a separate communication with the access card, and passes the key to the card. Ex. A, 13:30–14:7.

That separate-message architecture created a technical problem. Because the intermediate computer sat between the remote server and the access card, the arrangement imposed intermediate-software burdens: receiving and parsing server data, communicating with corresponding server modules, obtaining the key, and passing that key to the access card. The specification explains that this created design, deployment, maintenance, and security burdens, including the need to protect the specialized application and its communications from malicious programs running on the intermediate computer. Ex. A, 13:51–14:11. Thus, the old way was not simply "authentication." It was a less efficient access-card architecture in which key-management

2

delivery remained separate from the challenge-response interaction and pushed key-delivery work into the middle layer.



**B.    The New Way: The Challenge Message Becomes the Key-Delivery Vehicle**

The old architecture treated authentication and key-management delivery as separate message jobs. The '013 Patent changes that architecture by changing the authentication message itself. It does not claim "more authentication," or simply combine known authentication techniques. It teaches that authentication requests may include data strings "formatted to serve as challenges," and that challenge-response data strings can serve as vehicles for carrying key-management information. Ex. A, 2:14–23. Thus, the claimed challenge-data message performs two roles in the authentication protocol: it supports the challenge-response exchange while also carrying encrypted key-management information to the access card.

The specification explains why that design matters. In the prior architecture, specialized intermediate software received, parsed, decrypted, and passed the key payload. Ex. A, 13:51–

14:11. The patent's conduit approach changes that arrangement: the intermediate computer need not parse and process all payload communications; it can pass data between the server and the access card, and the conduit can be established without specialized software using standard web-browser software and a card-reader driver. Ex. A, 14:12–37.

That conduit and secure-channel discussion explains the technical benefit of the message design; CardAuth does not rely on secure-channel termination or the intermediate computer as standalone claim limitations. Claim 28 claims the access-card-side mechanism that enables the benefit. The access card receives payload-bearing challenge data in place of a bare challenge, decrypts the encrypted key-management payload carried in that challenge data, stores the recovered key-management information in card memory, and processes the challenge to generate the authentication response. Ex. A, 14:12–37, 14:63–15:21, 15:22–36, 33:55–34:22.



4

### C.      The Specific "How" of Claim 28

Claim 28 is where that message-architecture improvement becomes claim language. It first recites the access-card hardware: an interface, memory, and processor. It then defines the processor's configured operation at the message level. The processor receives, via the interface and according to an authentication protocol, challenge data rather than a bare challenge. The claim then specifies what makes that message different from an ordinary challenge: the challenge comprises one or more random numbers, while the challenge data comprises encrypted key-management information, and the challenge is processed to generate a response according to the authentication protocol. Ex. A, 33:49–34:13.

After defining that payload-bearing authentication message, Claim 28 recites what the access card does with the payload. The processor obtains key-management information from the challenge data by decrypting the encrypted key-management information and stores the recovered key-management information in the access card's memory. Ex. A, 34:5–22. In that way, the claim ties the message content to concrete access-card processing: receive the protocol-compatible challenge data, open the encrypted key-management payload on the card, store the recovered information in card memory, and still process the challenge to generate the authentication response.

Those limitations recite the "how." Claim 28 does not merely claim the goal of secure authentication, and it does not merely claim receiving, decrypting, and storing data. It specifies a particular access-card authentication-message architecture: replace a bare challenge with payload-bearing challenge data, use that challenge data to carry encrypted key-management information, have the access card obtain and store that information internally, and still process the challenge to generate the authentication response. That is the concrete architecture described in the specification, where challenge-response data strings serve as vehicles for key-management information, rather than merely claiming the abstract result of secure access. Ex. A, 2:14–23, 33:55–34:22.

5



## II.    ALICE STEP ONE: CLAIM 28 IS NOT DIRECTED TO AN ABSTRACT IDEA

### A.    Thales's Abstract Idea Deletes the Claim's Message Architecture

Thales does not analyze Claim 28 as written. It pulls out three verbs—receive, obtain, and store—and recasts the claim as collecting, recognizing, and storing data. Mot. at 8–9. That framing is too general. Claim 28 does not claim data handling wherever it occurs. It claims an access-card authentication architecture in which the access card receives challenge data according to an authentication protocol; the challenge data is received in lieu of a challenge; the challenge comprises random-number material; the challenge data carries encrypted key-management information; and the access card obtains and stores that key-management information and processes the challenge to generate the authentication response. Ex. A, 33:55–34:22. Alice step one asks what the claim is directed to, not what remains after the claim's architecture is stripped away. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379–80 (Fed. Cir. 2024).

6

The omitted limitations are the point of the claim. A result-only claim would say to authenticate an access card or securely deliver key-management information. Claim 28 recites how that is done: it changes the authentication message. Instead of a bare challenge traveling through one path and key-management information through another, the access card receives a payload-bearing challenge-data message. That message supports the challenge-response exchange while also carrying encrypted key-management information to the access card. The specification describes the same message design: authentication-request data strings can be "formatted to serve as challenges," and challenge-response data strings can serve as vehicles for key-management information. Ex. A, 2:14–23. In the combined secure-session/key-transmission embodiment, encrypted short-term access keys or other key-management information can be hidden within seemingly random challenge strings. Ex. A, 15:22–36.

That is why *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014), does not fit. There, the claims were directed to collecting data from documents, recognizing selected information, and storing it. *Id.* at 1347. Here, receiving, decrypting, and storing are not abstract data handling untethered to any technological arrangement. They are steps in a particular authentication-message mechanism performed by the access card. Nor is this merely data collection limited to particular content. The point is not just what data is received; it is how the authentication message is structured and where the encrypted key-management payload is processed. Thales can compare Claim 28 to *Content Extraction* only by treating the claimed challenge data as any collected data, encrypted key-management information as any recognized data, and access-card memory as any storage. That is not Claim 28. It is the abstraction left after deleting the claim's message architecture.

**B.    Claim 28 Is Directed to a Specific Access-Card Authentication Improvement**

Once Thales's abstraction is set aside, the focus of Claim 28 is straightforward. Claim 28 operates in the field of authentication, but it is not directed to "authentication" as such. It is directed to a specific improvement in access-card authentication: changing the authentication message so that the access card receives payload-bearing challenge data in place of a bare challenge. That

challenge data carries encrypted key-management information, and the access card obtains and stores that information and processes the challenge to generate the authentication response. Ex. A, 33:55–34:22. That is a concrete authentication-message architecture, not an abstract instruction to verify identity.

The specification confirms why that architecture matters. In the prior architecture described in the patent, key-management delivery would remain separate from the challenge-response exchange, requiring intermediate software to parse, decrypt, and pass key-management payloads before the access card could use them. Ex. A, 13:30–14:11. The patent changes that arrangement by changing the message design. Authentication-request data strings can be "formatted to serve as challenges," and challenge-response data strings can serve as vehicles for carrying key-management information. Ex. A, 2:14–23. In the combined secure-session/key-transmission embodiment, encrypted short-term access keys or other key-management information can be hidden within seemingly random challenge strings. Ex. A, 15:22–36.

Thales says the improvement is not tied to the claim because Claim 28 does not recite an intermediate device or secure-channel termination. Mot. at 11–12. That misses the point. The Federal Circuit has rejected the premise that the claim itself must expressly recite every advantage of the claimed combination. *See Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) ("Claims need not articulate the advantages of the claimed combinations to be eligible."). Claim 28 recites the access-card-side mechanism that provides the improvement: the access card receives the payload-bearing challenge data, obtains key-management information from that challenge data by decrypting the encrypted key-management information, stores that information in card memory, and processes the challenge to generate the response. Ex. A, 33:55–34:22. Claim 28 need not recite every surrounding conduit component or expressly state the secure-channel consequence to claim the access-card-side mechanism disclosed by that architecture. The improvement is technological because it changes how the authentication exchange is structured and how the access card obtains and stores protected key-management information during authentication.

8

That is the same kind of practical authentication improvement the Federal Circuit recognized as patent eligible in *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097–99 (Fed. Cir. 2021). There, the court held that claims reciting a specific improvement to a computer-implemented authentication technique were patent eligible, even though authentication itself was a familiar concept. Claim 28 likewise does not claim more authentication, a generic security result, or a generic instruction to receive and store data. It claims a specific access-card authentication-message architecture. Thales's framing fails because it characterizes the claim by the general field of authentication and generic data-handling verbs, rather than by the specific mechanism the claim recites.

### C.    Thales's Broader Data-Processing Cases Do Not Control

Section II.A explains why *Content Extraction* does not fit: Thales can compare Claim 28 to collecting, recognizing, and storing data only by deleting the authentication-message architecture the claim recites. The rest of Thales's data-processing cases are further afield.

*Electric Power* involved claims focused on information itself—collecting, analyzing, and displaying data—without a specific technological mechanism for improving how a computer system operated. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353–54 (Fed. Cir. 2016). Thales invokes that line of cases to argue that limiting the data to challenge data, random numbers, or encrypted key-management information merely limits generic data processing to particular content. Mot. at 7–8. But Claim 28 is not eligible merely because the data has particular content. It is eligible because the claim recites a particular message structure and card-side operation: challenge data is used in place of a bare challenge, carries encrypted key-management information, and is processed by the access card according to the authentication protocol. The point is the authentication architecture, not the subject matter of an abstract data set.

Recent Federal Circuit authority confirms the same distinction. In *Ollnova Techs. Ltd. v. ecobee Techs. ULC*, Nos. 2025-1045, 2025-1046, slip op. at 27–30 (Fed. Cir. June 4, 2026), the defendant characterized the claims as directed to collecting, analyzing, and selectively communicating data. The Federal Circuit rejected that framing because it oversimplified the claims

and ignored their specific operational limitations, including constraints governing when and how data was collected and transmitted within a network. Claim 28 is analogous. Thales's abstraction ignores the specific operational limitations that matter: challenge data is received in place of a bare challenge, the challenge data carries encrypted key-management information, and the access card decrypts, stores, and processes the received authentication message according to the authentication protocol. Ex. A, 33:55–34:22. Those limitations define a particular authentication-message mechanism, not generalized data handling.

TLI is likewise different. There, the claims used generic computer components to classify, transmit, and store digital images, while the specification described the hardware in purely conventional terms. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611–15 (Fed. Cir. 2016). Claim 28 does not merely invoke a generic device to store information. It defines an access card with an interface, memory, and processor configured to perform a specific authentication-message operation. The card receives protocol-compatible challenge data, obtains key-management information from that challenge data by decrypting encrypted key-management information, stores it in card memory, and processes the challenge to generate the authentication response. Ex. A, 33:49–34:22. That is the concrete "how" missing from Thales's generic data-processing cases.

Nor does *ChargePoint* change the result. *ChargePoint* rejected claims that invoked conventional network components to achieve a desired result without reciting the asserted technological improvement in the claim. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766–70 (Fed. Cir. 2019). Claim 28 recites the improvement. It does not merely say "authenticate securely" or "store data on a card." It recites the payload-bearing challenge-data message and the access-card-side decryption, storage, and response processing. Ex. A, 33:55–34:22. Thales's authorities therefore control only after Thales deletes that architecture and treats the claim as if it were directed to any data received, any information recognized, and any memory storage. Alice step one does not permit that shortcut.

10

### III.    ALICE STEP TWO: THE ORDERED COMBINATION SUPPLIES AN INVENTIVE CONCEPT

#### A.    Thales Atomizes the Ordered Combination Into Familiar Pieces

Thales's step-two argument repeats its step-one error. After abstracting Claim 28 into generic data handling, Thales separates the claim into familiar ingredients—an access card, an interface, a processor, memory, receiving data, decrypting data, and storing data—and declares each piece conventional. Mot. at 9–10. But *Alice* step two does not ask whether each ingredient, viewed alone, was known. It asks whether the claim elements, "both individually and as an ordered combination," transform the alleged abstract idea into a patent-eligible application. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). And an inventive concept can reside in a "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Thales never addresses Claim 28 at that level. It treats the claim as if it recited any interface receiving any data, any processor decrypting any information, and any memory storing any result.

#### B.    The Inventive Concept Is the Ordered Access-Card Arrangement

The inventive concept is the ordered access-card arrangement, not any isolated component. Claim 28 ties a specific authentication-message format to specific access-card processing. The access card receives challenge data according to an authentication protocol and in lieu of a bare challenge. The challenge data itself comprises encrypted key-management information. The access card then obtains key-management information from that challenge data by decrypting the encrypted key-management information, stores the recovered information in access-card memory, and processes the challenge to generate the authentication response. Ex. A, 33:55–34:22.

That arrangement matters because it changes where and how key-management delivery occurs. The specification identifies the old problem: key-management delivery would remain separate from the challenge-response exchange and require intermediate software to parse, decrypt, and pass key-management payloads before the access card could use them. Ex. A, 13:30–14:11. Claim 28 recites the access-card side of the disclosed solution: the key-management

11

payload is carried in challenge data received by the access card, and the access card performs the card-side decryption and storage operation internally. Ex. A, 33:55–34:22. Thales says the components were known, Mot. at 9–10, but the inventive-concept question is whether the claimed ordering and allocation of those functions was conventional. Thales has not shown that.

C.    **Thales Cannot Establish Conventionality on the Pleadings**

Thales also cannot establish conventionality at the pleading stage. Rule 12 dismissal is improper where the complaint plausibly alleges that the claimed combination was not well-understood, routine, and conventional. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–28 (Fed. Cir. 2018). That is this case. Thales points to familiar ingredients, but the First Amended Complaint pleads a specific arrangement: the prior separate-message architecture, the intermediate-software burden, the challenge-data solution, the Wilding prosecution-history distinction, and the concrete Thales FIDO/key-handle implementation. FAC ¶¶ 7–13, 17–22.

Thales's reliance on the first Office Action does not carry its burden. A preliminary prior-art rejection of earlier claims does not establish that the finally allowed ordered architecture was well-understood, routine, and conventional. The specification identifies the prior separate-message architecture, explains the intermediate-software burden, and discloses the challenge-data solution. Ex. A, 2:14–23, 13:30–14:11, 14:12–37, 15:22–36. The prosecution history confirms the same architectural distinction: the applicant distinguished Wilding because its client identification and client challenge information packages were not challenge data used according to an authentication protocol and were not processed in the claimed manner to obtain key-management information by decrypting encrypted key-management information. Ex. B, Aug. 9, 2013 RCE Remarks at 8–10. The FAC also alleges that Thales's accused hardware security keys receive U2F Authenticate request data containing challenge-related material and a key handle, that Thales's own FIPS materials identify keys used for encryption, decryption, and authentication of key handles, and that recovered key-management information is stored in token memory during authentication. FAC ¶¶ 17–22. Those allegations must be accepted as true at this stage.

12

## IV.   AT A MINIMUM, THE ALICE MOTION CANNOT BE RESOLVED BY ASSUMING THALES'S DISPUTED CLAIM MEANINGS

At minimum, Thales's § 101 motion should not be resolved on the pleadings by adopting Thales's preferred claim meanings. When a claim-construction dispute affects the eligibility analysis, the Court must account for that dispute before granting dismissal. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379–80 (Fed. Cir. 2019). This Court has applied that principle in the § 101 context, denying a Rule 12 motion before claim construction where the Court could not yet determine whether the asserted patent was directed to an abstract idea or claimed an inventive concept. *A Pty Ltd. v. Amazon.com, Inc.*, No. 1:15-CV-154-RP, 2015 WL 10990117, at \*5 (W.D. Tex. Oct. 8, 2015).

The disputed claim meanings matter here. Thales's *Alice* theory depends on treating Claim 28 as generic receiving, obtaining, and storing, while stripping away the claim's payload-bearing challenge-data architecture. CardAuth's reading is supported by the intrinsic record and the FAC: "challenge data" is the payload-bearing authentication message received in place of a bare challenge, and Claim 28 recites what the access card does with that message—obtaining and storing the encrypted key-management information and processing the challenge to generate the authentication response. Ex. A, 2:14–23, 15:22–36, 33:55–34:22; FAC ¶¶ 10–12. Under that reading, Claim 28 is not generic data handling. It is the specific access-card authentication-message architecture described above.

Thales's own positions confirm that claim meaning is central, not peripheral. Before suit, Thales asserted that the phrase "challenge data is received in lieu of a challenge" was supposedly "impossible to interpret," that the patent allegedly did not explain the difference between "challenge" and "challenge data," and that there was supposedly no support for retrieving key-management information from challenge data. Ex. C at 2. Thales also argued that the claimed "access card" does not map to the accused FIDO implementation because, in its view, certain operations are performed by an "authentication device or server" rather than by the access card. *Id*. Those are claim-construction and infringement disputes. Thales cannot obtain Rule 12

13

dismissal under § 101 by erasing the architecture those terms define and replacing it with its own preferred abstraction. If the Court does not reject Thales's *Alice* theory outright, the motion should at least be denied without prejudice until claim construction.

## V.     THALES'S § 112 ARGUMENT FAILS

### A.     Claim 28 Is Not Internally Inconsistent

Thales's internal-inconsistency argument depends on an unnecessary construction. Thales reads "the challenge data is received in lieu of a challenge" to mean that the received challenge data cannot include any challenge material at all. Mot. at 17–18. But Claim 28 does not say that. It says the processor receives challenge data according to an authentication protocol, the challenge data is received in lieu of a challenge, the challenge comprises one or more random numbers, the challenge data comprises encrypted key-management information, and the challenge is processed to generate the authentication response. Ex. A, 33:55–34:22. The claim uses "comprises," and nothing in the claim language says the challenge data consists only of encrypted key-management information or excludes the random-number challenge material. The natural reading is that the access card receives a richer, payload-bearing authentication message in place of a bare challenge. That challenge data includes challenge material and encrypted key-management information, and the access card processes the challenge material to generate the response.

That reading gives effect to every limitation. "Challenge" and "challenge data" are distinct, but distinct does not mean mutually exclusive. The "challenge" is the random-number challenge material. The "challenge data" is the payload-bearing authentication message received in place of a bare challenge and carrying encrypted key-management information. CardAuth is therefore not asking the Court to rewrite "in lieu of" as "in addition to." CardAuth accepts the ordinary "in place of" meaning: the access card receives challenge data instead of a separate bare challenge; the challenge material is processed as part of that received challenge data. That is exactly what the First Amended Complaint pleads: "the challenge data is a payload-bearing authentication message received in place of a bare challenge, while the challenge is still processed to generate the authentication response." FAC ¶ 12.

14

Thales's cases do not require a different result. *Chef America* prevents courts from rewriting claims to preserve validity. See *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). But CardAuth's reading does not rewrite anything; it harmonizes the words Thales separates. *Becton Dickinson* and *Bicon* require giving effect to distinct claim language, and CardAuth's reading does so: "challenge" identifies the random-number material, "challenge data" identifies the payload-bearing message, and "in lieu of" confirms that the payload-bearing message replaces a bare challenge. See *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). Nor does dependent Claim 33 make Claim 28 facially incoherent. Claim 28 is already coherent because the challenge material can be processed from the received challenge data. At most, Claim 33 raises a claim-scope question about an additional receiving limitation in a dependent claim. It does not establish, on the pleadings, that independent Claim 28 fails to inform a skilled artisan of its scope with reasonable certainty.

The alleged contradiction also fails under *Maxell, Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1374 (Fed. Cir. 2024). There, the Federal Circuit reversed an indefiniteness ruling because the allegedly inconsistent limitations could be satisfied together. The same is true here. Claim 28's requirements can be satisfied together: challenge data is received in place of a bare challenge, that challenge data carries encrypted key-management information, and the access card processes the challenge material in that challenge data to generate the response.

### B.    The Specification Supports CardAuth's Reading

The specification supports CardAuth's reading, not Thales's. Thales relies on Figure 8 and argues that the patent sometimes labels item 410 as "challenge" and sometimes describes it as "challenge data." Mot. at 18–19. But that does not create indefiniteness. It confirms that challenge data can contain the challenge material. The text describing Figure 8 explains that card reader 220 generates "challenge data 410," that the challenge data can consist of or include a large random number, and that the card reader transmits "challenge data 410" to access card 110. Ex. A, 19:15–23. The access card then stores challenge data 410 and processes it in the on-card authentication

protocol to generate the card response. Ex. A, 19:24–34. A figure label saying "Transmit Challenge" does not override that textual disclosure; it reflects the same point CardAuth makes here—challenge data can serve the role of the challenge in the authentication exchange.

Figure 12 makes the same point visually: the flowchart directs "Transmit challenge data to the access card," and then states that the access card uses a card authentication protocol to generate a candidate response "from the challenge data and the card key." Ex. A, Fig. 12. Thus, the patent itself depicts challenge data—not a separately transmitted bare challenge—as the data used in the authentication-response path.

The rest of the specification confirms the same architecture. The point is not that the specification uses the exact phrase "in lieu of." The point is that it discloses the message design that phrase captures. The patent expressly teaches that authentication-request data strings can be "formatted to serve as challenges" and that challenge-response data strings can serve as vehicles for carrying key-management information. Ex. A, 2:14–23. It then describes the combined secure-session/key-transmission embodiment, where a challenge string can include "an encrypted version of the short-term access keys, or other key-management information," hidden within "seemingly random challenge strings." Ex. A, 15:22–36. That is the distinction Thales says the specification lacks: "challenge" refers to the random-number challenge material, while "challenge data" refers to the richer protocol message received in place of a bare challenge and carrying encrypted key-management information.

The prosecution history confirms the same architectural distinction: the applicant distinguished Wilding because its client identification and client challenge information packages were not challenge data used according to an authentication protocol and were not processed in the claimed manner to obtain key-management information by decrypting encrypted key-management information. Ex. B, Aug. 9, 2013 RCE Remarks at 8–10. That distinction makes sense only if "challenge data" can be more than a bare random challenge, while still being used and processed according to the authentication protocol. Thales's reading would erase that disclosed and prosecuted architecture rather than clarify it.

16

C.     **At Minimum, The Issue Is Claim-Construction Dependent and Premature**

At minimum, Thales's § 112 argument should not be resolved on the pleadings by adopting Thales's preferred construction of disputed claim language. Indefiniteness is part of claim construction, and although claim construction may sometimes occur at the pleading stage, dismissal is improper where the motion depends on a disputed construction that cannot be resolved cleanly on the pleadings. See *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012); *UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984, 991–94 (Fed. Cir. 2024). This is not a facial contradiction. Thales's argument depends on construing "challenge data is received in lieu of a challenge" to mean that the received challenge data cannot contain the challenge material later processed by the access card. But the intrinsic record supports CardAuth's construction: challenge data is a payload-bearing authentication message received in place of a separate bare challenge, and the challenge material is processed as part of that received challenge data. The Court need not finally construe those terms now; it need only decline to resolve that disputed claim meaning in Thales's favor on a Rule 12 record.

Thales's own pre-suit position confirms that claim construction is central. Before suit, Thales asserted that the phrase "challenge data is received in lieu of a challenge" was supposedly "impossible to interpret," that the patent allegedly did not explain the difference between "challenge" and "challenge data," and that there was supposedly no support for retrieving key-management information from challenge data. Ex. C at 2. Those are claim-meaning disputes. They should not be resolved against CardAuth on a Rule 12 record. Accordingly, the Court should reject Thales's § 112 argument on the merits. But if the Court is not prepared to do so now, it should deny the § 112 motion without prejudice to claim construction.

VI.    **DISMISSAL WITH PREJUDICE WOULD BE IMPROPER**

Dismissal with prejudice would be especially improper. Thales's motion turns on disputed claim meaning, disputed conventionality, and allegations now addressed in the First Amended Complaint. If the Court concludes that any issue cannot be resolved on the current pleadings, the proper course is to deny the motion without prejudice to Thales renewing its arguments after claim

17

construction or, at most, to grant leave to amend—not to enter a pleading-stage judgment extinguishing the case.

## CONCLUSION

Claim 28 is not directed to authentication generally or to generic data handling. It claims a specific access-card architecture in which payload-bearing challenge data replaces a bare challenge, carries encrypted key-management information, and is processed by the access card through decryption, storage, and generation of the authentication response. The specification describes that architecture, the claim recites it, and the First Amended Complaint alleges that Thales's accused FIDO security keys implement it.

Thales's § 101 argument succeeds only by erasing that architecture and treating the claim as generic receive/obtain/store functionality. Its § 112 argument succeeds only by adopting Thales's disputed construction of "challenge," "challenge data," and "in lieu of a challenge." Neither approach is proper on Rule 12. CardAuth respectfully requests that the Court deny Thales's motion. If the Court concludes that claim construction is necessary, the motion should be denied without prejudice to renewal after claim construction.

Dated:  June 29, 2026                                    Respectfully Submitted,

/s/ *Bradford J. Black*
Bradford J. Black
Texas Bar No. 24086243
bblack@bradfordblack.com
**BRADFORD BLACK P.C.**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (415) 813-6211
Facsimile: (415) 813-6222

*Attorneys for Plaintiff*
CARDAUTH SOLUTIONS LLC

18

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service on June 29, 2026, via electronic filing using the Court's CM/ECF system.

/s/ *Bradford J. Black*

19